genuine disputed factual issue, plaintiffs' motion for summary judgment will be granted.

The Court will enter an appropriate order.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

**THIS MATTER,** having come before the Court on the motion of Saastopankkien Keskus–Osake–Pankki ("Skopbank") and the Government Guarantee Fund of the Republic of Finland ("GGF") (hereinafter "plaintiffs") for summary judgment under FED.R.CIV.P. 56 for the foreclosure of the property interests claimed by Nicholas Gileta, Theodore S. Miazga, Adrienne C. Miazga, Jack H–N Tseng, and Fay Chin Tseng ("the Gileta Defendants"); Tandem, Inc. (hereinafter "Tandem"), Masonry Products, V.I. Corp. ("Masonry Products"), Drake Limited ("Drake") (collectively "the Easement defendants"); and the Government of the Virgin Islands ("the Government") in property known as Parcel No. 479A, Estate Chocolate Hole, No. 11 Cruz Bay Quarter, St. John, U.S. Virgin Islands, being 7.1783 acres, more or less, as shown on PWD No. D9–4224–T88;

The Court, having received no opposition to plaintiffs' motion from the defendants, with the exception of Tandem, Inc. (hereinafter "Tandem"); and

Having heard oral argument from the parties on plaintiffs' motion on April 11, 1997 and March 17, 1998; and

Having granted Tandem additional time in which to conduct discovery on April 17, 1997; and

Having found that the above-claimed interest should be foreclosed by the Court's ruling in the case captioned *Saastopankkien Keskus–Osake–Pannki (Skopbank) v. Great Cruz Bay Development Co., Inc. et al.,* Civ. No.1991–355 (D.V.I. June 8, 1993), *aff'd,* 74 F.3d 1227 (3d Cir.1995) and by Consent Judgment entered February 17, 1995 and that Tandem should be bound by such judgment; and

for the reasons set forth in the Court's opinion of this date;

**IT IS,** on this 2nd day of June, 1998 hereby **ORDERED** that plaintiffs' motion for

summary judgment for foreclosure of the subject real property is granted.

**IT IS FURTHER ORDERED** that counsel for the plaintiffs shall submit to the Court within ten (10) days a proposed form of order.

No Costs.

Paul S. BRUCE

v.

## INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, et al.

### No. CIV. L–97–2796.

United States District Court,
D. Maryland.

May 15, 1998.

Ranson J. Davis, Baltimore, MD, for Paul S. Bruce.

Kevin Marrinan, Gleason and Matthews, P.C., New York, NY, Bernard J. Sevel, Sevel and Sevel, P.A., Baltimore, MD, for defendant International Longshoremen's Ass'n, AFL–CIO.

Gil A. Abramson, Mark S. Saudek, Hogan and Hartson, L.L.P., Baltimore, MD, for defendant Steamship Trade Ass'n of Baltimore, Inc.

Joel A. Smith, Sarah P. Harlan, Kahn, Smith and Collins, P.A., Baltimore, MD, for defendant International Longshoremen's Ass'n Local 333.

## MEMORANDUM

LEGG, District Judge.

The plaintiff, Paul S. Bruce, is 62 years old and has been a longshoreman in Baltimore since 1971. He filed this action against defendants, International Longshoremen's Association, AFL–CIO ("ILA"), ILA Local 333 ("Local 333"), and the Steamship Trade Association of Baltimore, Inc. ("STA"), for violations of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, and the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* Bruce claims, *inter alia,* that the defendants (1) wrongfully suspended him from his position following an allegedly inaccurate and unlawfully administered urinalysis exam on August 24, 1995, in which Bruce tested positive for Phenycycladine ("PCP"), and (2) denied him an opportunity properly to challenge the results of that exam. Bruce also seeks a declaration, pursuant to 28 U.S.C. § 2201, that the testing procedures, including the requirement that he sign a consent form, violated his constitutional rights.

In addition, Bruce challenges the conditions under which he was eventually reinstated as a longshoreman. Following the completion of a drug rehabilitation program on December 23, 1996, Bruce was reinstated on May 1, 1997. Bruce, however, was denied the seniority he had accrued prior to his suspension. Bruce alleges that such loss of seniority has caused him to work only sporadically since being reinstated, and claims that the denial of his seniority was wrongful, in violation of the collective bargaining agreement, and a breach of the union defendants' duty of fair representation. Bruce also claims that the union defendants failed properly to support his claim to preserve seniority. Finally, Bruce claims that the aggregate of all three defendants' conduct towards him was part of an unlawful, collusive scheme aimed at wrongfully reducing the number of longshoremen available for work in the port of Baltimore.

The defendants have filed a consolidated Motion for Summary Judgment. After ample opportunity for discovery, all issues have been fully briefed, and the Court held a hearing on the motion on April 16, 1998. For the reasons set forth below, the Court finds that Bruce's claims concerning the validity of the drug testing procedures and his attempts to challenge them are barred by the applicable statute of limitations. In addition, the Court finds that Bruce has failed to present sufficient evidence on which a reasonable jury could return a verdict in his favor concerning his claim for lost seniority. Finally, the Court finds that Bruce has presented no evidence of unlawful collusive activity on the part of the defendants. Accordingly, by separate Order the Court shall GRANT summary judgment to the defendants.

**Background**

Three different agreements govern labor relations in the longshore industry in the port of Baltimore. The Master Contract, negotiated between the ILA and a coalition of management representatives including the STA, covers all ILA Atlantic ports, including Baltimore. An agreement, known as the "Applicable to All Locals," covers all ILA locals in the port of Baltimore. Finally, relations between the STA and Local 333 specifically are governed by the "Cargo Agreement."

The Cargo Agreement governs the seniority system in use in the Baltimore longshore industry. Defendants' Exh. 8, at 105–119. The Cargo Agreement establishes a Seniority Board, composed of four Local 333 and four management representatives, "to assign personnel into seniority groups in accordance with their length of time and service in the industry." *Id.* at 106. The Cargo Agreement further provides that "the [Seniority] Board shall be the sole judge of the sufficiency of the evidence considered and its decisions shall be final and binding on all concerned..." *Id.* at 106.[1]

A Drug & Alcohol Abuse Program ("D & A Program") was adopted by the industry in January, 1992, as part of the Master Contract in all ILA Atlantic ports. In an effort to curb the use of alcohol and controlled dangerous substances in the workplace, the D & A Program included provisions for periodic testing of employees and sanctions for substance abuse. As originally designed, the D & A Program provided for the indefinite suspension of longshoremen who were twice found to have engaged in substance abuse in the workplace.

On May 1, 1994, a randomly administered urinalysis test showed evidence of PCP use by Bruce in the workplace. Because this was the first time Bruce tested positive for PCP, Bruce was suspended from work as a longshoreman for only sixty days under the D & A Program, beginning on May 23, 1994.

A condition of Bruce's reinstatement following his sixty-day suspension under the D & A Program was that Bruce submit to further, random testing for a period of eighteen months. Accordingly, a second test was administered to Bruce on August 24, 1995. The urine specimen was sent to the National Center for Forensic Science in Baltimore.

For the second time, the results came back positive for PCP use.

Bruce contested the accuracy of the August 24, 1995 test results. On September 1, 1995, Bruce obtained a conference with Medical Review Officer, Dr. W. Robert Lange. Bruce denied having used PCP since his reinstatement, and pointed to the negative results of two independent tests to which Bruce submitted voluntarily on August 15, 1995 and August 29, 1995.[2] Dr. Lange rejected Bruce's challenge, noting that MRO Plus, the facility selected by Bruce for voluntary testing, was not qualified to administer such tests.

In accordance with procedures established by the D & A Program and the Master Contract, Bruce filed a grievance with the Industry Grievance Committee (the "Grievance Committee") concerning the administration and results of the August 24, 1995 drug-screening test. The Committee, composed of representatives of both management and labor and including STA President Maurice Byan and ILA Vice–President Horace T. Alston, heard Bruce's grievance at a meeting on September 26, 1995. Matthew "Matty" Capp, then-President of Local 333, represented Bruce at the meeting. In the course of the September 26, 1995 meeting, the Committee rejected Bruce's challenge to the August 24, 1995 drug-screening test. The Committee also denied Bruce's request to proceed to the next step of the grievance procedure, which would have involved the appointment of an independent arbitrator. In accordance with the terms of the D & A Program in force at the time, Bruce was suspended indefinitely from the industry, effective September 26, 1995.

1. The seniority provisions of the Cargo Agreement were adopted in their entirety from the terms of a consent decree issued by this Court in *U.S. v. International Longshoremen's Association,* 319 F.Supp. 737 (D.Md.1970), *aff'd.,* 460 F.2d 497 (4th Cir.), *cert. denied,* 409 U.S. 1007, 93 S.Ct. 439, 34 L.Ed.2d 300 (1972).

2. Bruce also requested a second test of his August 24, 1995 urine sample. The second test, which did not involve the use of a split sample, was performed on September 15, 1995 at the National Health Laboratories in Herndon, Virginia and also yielded evidence of PCP use. Without expressing an opinion as to the accuracy of any of the tests administered to Bruce, the Court notes that, at the April 16, 1998 hearing, the defendants contended without objection that a heavy dosage of PCP would disappear from an individual's blood-stream within one to five days after use. It is therefore possible that, if Bruce had traces of PCP in his blood on August 24, 1995, such traces would have disappeared by the time of his independent test on August 29, 1995.

In October of 1996, however, a new Master Contract was negotiated by the industry, amending the D & A Program to include a so-called "third strike" opportunity provision. The "third strike" provision permitted the reinstatement, under certain conditions, of longshoremen who had been indefinitely suspended from the industry because of two violations of the D & A Program's policy. As a condition of reinstatement, the employee was required, *inter alia*, to provide "proof of successful completion of a rehabilitation program resulting in the individual being drug-free for twelve (12) months preceding the individual's formal application for reinstatement." Defendants' Exh. 9, D & A Program at 17.

The adoption of the new D & A Program raised questions concerning the seniority to be accorded personnel reinstated under the "third strike" provision. Different approaches were taken in different ILA Atlantic ports. In Baltimore, the Seniority Board met to discuss the issue on October 22, 1996. At the end of the meeting, the Seniority Board issued an unpublished ruling, according to which an employee who qualified to return to the industry under the "third strike" provision would not be entitled to his old seniority. Defendants' Exh. 13, Minutes of October 22, 1996 Seniority Board Meeting, ¶ 18(c).

Following the adoption of the new D & A Program, Bruce entered a drug rehabilitation program at Mount Manor Treatment Center in Emmitsburg, Maryland, on November 30, 1996. He successfully completed the program on December 23, 1996, and on April 28, 1997, the Grievance Committee, including Byan and Alston, approved Bruce for reinstatement. In accordance with the October 22, 1996 ruling of the Seniority Board, Bruce was reinstated without the seniority he had accrued prior to his second suspension from the industry.

On May 2, 1997, Bruce, with the assistance of Local 333, filed a complaint with the Seniority Board requesting reinstatement with seniority. By letter dated May 19, 1997, Byan advised Bruce that Bruce's request to preserve seniority had been discussed by the Seniority Board at a May 6, 1997 meeting and was under consideration. On June 4, 1997, Bruce appeared before the Seniority Board to argue his case. With the assistance of his current counsel, Bruce presented a prepared statement to the Seniority Board. Relying on its October 22, 1996 ruling, however, the Seniority Board rejected Bruce's appeal. Plaintiff's Exh. 26, Minutes Of June 4, 1997 Seniority Board Meeting, ¶ 6. Byan informed Bruce of this result by letter dated June 16, 1997.

On August 14, 1997, Bruce filed his Complaint with this Court.

**Discussion**

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether there is a genuine issue of material fact, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

Material factual disputes are "genuine" only if a reasonable jury could return a verdict for the non-moving party based upon the record as a whole. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

Bruce advances so-called "hybrid" claims under Section 301 of the Labor Management Relations Act, 1947 (the "Taft–Hartley Act"), 29 U.S.C. § 185, against the union defendants for breach of the duty of fair representation, and against STA for breach of the collective bargaining agreement.

In particular, Bruce claims (1) breach of duty of fair representation by defendants, ILA and Local 333, for refusing to (a) sup-

port Bruce's request to appoint an independent arbitrator to hear Bruce's appeal of the results of the August 25, 1996 drug test, and (b) support his challenge to the denial of his seniority upon reinstatement (Count 1); (2) breach of duty of fair representation by defendants, ILA and Local 333, for using and/or agreeing to the use of a consent form that was violative of Bruce's statutory and constitutional rights (Count 2); (3) breach of duty of fair representation by defendants, ILA and Local 333, for colluding with the defendant, STA, in adopting the "third strike" provision and denying Bruce seniority upon reinstatement (Count 3); and (4) breach of collective bargaining agreement by defendant, STA, for adopting the D & A Program, instituting the use of the Consent Form, failing to accord Bruce access to formal grievance procedures, denying Bruce seniority upon reinstatement, and colluding with defendants, ILA and Local 333 as set forth above (Count 4).

### a. Statute of Limitations

■ A six-month statute of limitations applies to "hybrid" claims under Section 301 of the Taft–Hartley Act, 29 U.S.C. § 185. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 171, 103 S.Ct. 2281, 2292, 76 L.Ed.2d 476 (1983). For limitations purposes, a Section 301 claim accrues "when the claimant discovers, or through the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *McCreedy v. Local Union No. 971*, 809 F.2d 1232, 1236 (6th Cir.1987). In the context of a grievance procedure, a union member's cause of action against the union may arise when

the member's grievance is denied and "the union takes an unequivocal position that it will not seek arbitration." *Id.*

■ In this case, on August 24, 1995 Bruce was presented with and signed the consent form in connection with his second drug-screening test. On September 26, 1995, the Grievance Committee addressed Bruce's complaint concerning the August 24, 1995 test. Bruce was present at the meeting. The Grievance Committee unanimously rejected Bruce's claims in the course of the September 26, 1995 meeting, and Alston personally and unequivocally advised Bruce that an independent arbitrator would not be appointed to address Bruce's demands.

Under such circumstances, Bruce was aware of the consent form, and of the allegedly unlawful circumstances surrounding his signing of it, on August 24, 1995 at the latest. Similarly, by September 26, 1995, Bruce was aware of the acts constituting the union defendants' alleged breach of duty with respect to the failure to appoint an arbitrator to hear his challenge to the drug-screening procedures and test results. Bruce filed this action nearly two years later, on August 14, 1997, well beyond the statutory time limit applicable to those claims. Accordingly, Bruce's claims concerning the consent form and the grievance procedure challenging the August 24, 1995 drug test are time-barred, and the Court shall dismiss them by separate order.[3]

### b. Seniority

In his effort to preserve seniority upon reinstatement, Bruce asks this Court to over-

---

**3.** At the April 16, 1998 hearing in this Court, Bruce contended for the first time that the six-month statute of limitations applicable to "hybrid" claims should not apply to his request for declaratory relief concerning the constitutionality of the August 24, 1995, drug-testing procedures and the use of the consent form. A declaratory judgment action, however, is a procedural device used to vindicate substantive rights and, as such, it is "barred to the same extent that the claim for substantive relief on which it is based would be barred." *Int'l Ass'n of Machinists & Aerospace Workers v. Tennessee Valley Authority*, 108 F.3d 658, 668 (6th Cir.1997); *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir.1992), *cert denied*, 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993).

Here, Bruce seeks a declaration "that the drug-screening test administered to Plaintiff on August 24, 1995 was invalid,... any and all consequences and/or penalties imposed on Plaintiff because of the test must be nullified... [and] Defendants have violated Plaintiff's constitutional and statutory rights with respect to the administration of the drug-screening test and the use of the test results." Complaint, Counts I and II. In other words, Bruce's request for declaratory relief is retrospective, and as such identical with his substantive request for relief under the labor laws. Accordingly, the same statute of limitations applies to both claims.

rule the October 22, 1996 ruling of the Seniority Board, and contends that the union defendants breached their duty of fair representation by (a) failing properly to support Bruce's grievance against his reinstatement without seniority; and (b) agreeing to the adoption of the "third strike" provision in the course of collective bargaining without ensuring that reinstated employees would be permitted to preserve seniority.

■ In order to prevail against the union defendants for breach of the duty of fair representation, Bruce must show that their conduct was either "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916–17, 17 L.Ed.2d 842 (1967). In this context, a union's actions are "arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Association, International v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991) (citations omitted). Such a standard applies to all union activity affecting Bruce's interests, including contract negotiations. *Id.*

■ In the context of a grievance procedure, "[a] grievance committee's decision is entitled to substantial deference, similar to that of an arbitration award, and cannot be overturned as long as it is based upon some support in the record." *International Longshoremen's Association, AFL–CIO v. Cataneo, Inc.,* 990 F.2d 794, 799 n. 11 (4th Cir. 1993).[4] Similarly, a union's refusal to process an employee's grievance on the belief that such grievance is unwarranted does not amount to the sort of "gross deficiency" or "reckless disregard" necessary to constitute a breach of the duty of fair representation. *Amburgey v. Consolidation Coal Co.,* 923 F.2d 27, 30 (4th Cir.1991).

■ In this case, the Seniority Board was clearly acting within the limits of its authority when it ruled, on October 22, 1996, that Baltimore longshoremen who were reinstated under the "third strike" provision would not be entitled to the seniority accrued prior to suspension. Bruce disputes the Board's authority by arguing that the October 22, 1996 ruling was not addressed to a particular individual, but was general in nature, and by pointing to different approaches to reinstatement taken by local authorities in other ILA Atlantic ports. These arguments, however, are without merit.

As noted above, the Cargo Agreement, which created the Seniority Board, invested it with the authority to allocate seniority among categories of union members in Baltimore, according to "length of time and service in the industry." Cargo Agreement § 22. The fact that the October 22, 1996 ruling addressed an entire category of longshoremen (those reinstated pursuant to the third strike provision) rather than particular individuals, does not take the decision outside the purview of the Board's authority. Rather, it suggests that the Board chose to address efficiently, once and for all, a problem that was likely to present itself in the same posture, time and again, in the context of many separate individual cases.

Similarly, the fact that local entities in other ILA Atlantic ports chose to approach the matter differently than the Seniority Board does not mean that the Board was without authority to reach its decision. It simply confirms that local entities were authorized, under the overall contractual scheme, to select the approach best suited to each particular locale.

■ In addition to being within the scope of the Seniority Board's authority, the October 22, 1996 ruling was far from irrational. To the contrary, the Cargo Agreement unequivocally provides that "[a]ll employees

---

4. In this respect, the Supreme Court has held that courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts... The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract... *as long as an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.*" 484 U.S. 29, 38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987) (emphasis added).

must total 700 hours per year in order to retain their seniority once established." Cargo Agreement § 22(I)(3). The Cargo Agreement further provides that such "[h]ours must be either worked, badged-in credit hours or hours credited due to allowable breaks in service..." *Id.*[5] The D & A Program provides that, in order to be eligible for reinstatement under the "third strike" provision, an employee must provide proof of having been drug-free for the twelve months preceding his application for reinstatement. D & A Program § 9(A).

Thus, the October 22, 1996 ruling was based on the Seniority Board's reasoning that an employee suspended indefinitely under the D & A Program would have to wait at least twelve months to qualify for reinstatement under the "third strike" provision. During those twelve months, a suspended longshoreman would not amass any hours of work toward the 700 hour requirement. In effect, the Seniority Board decided that the period of suspension would not constitute an "allowable break in service" under the Cargo Agreement. Deposition of Willis N. Schonowski, Sr., at 28.[6] Consequently, a longshoreman reinstated under the "third strike" provision would not be entitled to preserve his seniority. Such reasoning is reasonable and, therefore, entitled to deference under applicable standards.

■ For similar reasons, the union defendants did not breach their duty of fair representation by failing to press for an appeal of the Seniority Board's June 4, 1997 denial of Bruce's particular claim for seniority. It is undisputed that Local 333 assisted Bruce in submitting his initial grievance to the Seniority Board. On June 4, 1997 the Seniority Board denied Bruce's claim by relying on the reasoning and authority of the Board's October 22, 1996 ruling. Because, as shown above, the October 22, 1996 ruling was reasonable, the union defendants were entitled to consider an appeal on Bruce's behalf to be

unwarranted. Under such circumstances, the union defendants were entitled, without thereby breaching of the duty of fair representation, to refuse to appeal the Board's June 4, 1997 ruling on Bruce's claim. *See Amburgey*, 923 F.2d at 30.

■ Finally, the record is devoid of any evidence to support Bruce's allegations of wrongful collusive activity between the STA and the union defendants. Bruce claims that (1) the STA and the ILA colluded in an effort to reduce the number of longshoremen available for work in the port of Baltimore; (2) the new Master Contract was an example of such collusion because it failed to guarantee that the seniority of longshoremen reinstated under the "third strike" provision would be preserved; and (3) the Seniority Board was similarly biased in interpreting the Cargo Agreement to deny seniority to longshoremen reinstated under the "third Strike" provision.

At the April 16, 1998 hearing, Bruce presented no evidence on these points. Bruce's counsel contended that he should be entitled to further discovery on these issues, because the defendants' motion for summary judgment addressed only statute of limitations questions.

The Court disagrees with this position. Bruce's Complaint, filed on August 14, 1997, alleges collusion. The discovery schedule permitted discovery on all issues. The defendants' motion for summary judgment addressed collusion claims as well as limitations issues. Bruce's response to the defendants' motion for summary did not raise a discovery problem.

Despite ample opportunity for discovery, Bruce presents no evidence on which a reasonable jury could conclude that the defendants colluded as alleged. In addition, under the Master Contract that preceded the institution of the "third strike" provision, suspended longshoremen had no opportunity for

---

5. Allowable breaks in service include absences due to illness, military service, leave under certain conditions, service in a supervisory or managerial position within the industry or as an ILA officer, or employment by a fund jointly administered by the ILA and the STA. Cargo Agreement § 22(I)(4).

6. Willis N. Schonowski was President of Local 333 in October, 1996, and Co–Chairman, with Maurice C. Byan, of the Seniority Board.

reinstatement after the second suspension for drug and alcohol abuse. The introduction of the "third strike" provision thus increased the labor supply, albeit leaving seniority decisions in the hands of representatives of the STA and the union locals.

There is no evidence that the October 22, 1996 ruling of the Seniority Board reduced the total number of longshoremen. That ruling merely shifted employment priorities based on seniority in favor of longshoremen with one or no suspensions for drug and alcohol abuse. This, however, in no way supports a finding of unlawful collusion. Unions must represent the interests of diverse categories of members. Had full seniority been guaranteed to those reinstated under the "third strike" provision, the interests of other longshoremen, who had never breached the terms of the D & A Program, might have been harmed as a result. The union defendants' collective bargaining position was entirely within the unions' lawful rights.

In short, no reasonable jury could find that the union defendants breached their duty of fair representation with respect to any of Bruce's claims concerning the Seniority Board's denial of his accrued seniority upon reinstatement. Similarly, no reasonable jury could conclude on this record that the union defendants and the STA colluded in an unlawful effort to reduce the number of longshoremen working in Baltimore. Accordingly, the Court shall grant the defendants summary judgment as to those claims.

## Conclusion

For the reasons stated, the Court by separate Order shall grant the defendants summary judgment.